DETROIT, T. & I. R. CO. v. BANNING.

No. 10744.

United States Court of Appeals Sixth Circuit.

April 5, 1949.

Henry C. Bogle, of Detroit, Mich. (Henry C. Bogle and Harold A. Johnson, both of Detroit, Mich. on the brief; Bodman, Longley, Bogle, Armstrong & Dahling, of Detroit, Mich., of counsel), for appellant.

Harrison T. Watson, of Detroit, Mich., and Lloyd T. Bailey, of Chicago, Ill. (Harrison T. Watson, of Detroit, Mich., and Lloyd T. Bailey, of Chicago, Ill., on the brief; Bailey & Lyons, of Chicago, Ill., of counsel), for appellee.

Before SIMONS, McALLISTER and MILLER, Circuit Judges.

MILLER, Circuit Judge.

The Appellant Railroad Company appeals from a judgment of the District Court in favor of the appellee in an action brought under the Federal Employers' Liability Act, 45 U.S.C.A. §§ 51–60. The principal issue presented is whether the charge of the District Judge to the jury correctly presented the issue of negligence under the evidence received by the jury.

Appellee Banning was employed by the Appellant in July, 1945 as a brakeman. At the time of the accident on September 23, 1946, he was working as a member of a switching crew which was making up a freight train. It had been raining all day. During the evening, the crew took a Diesel engine into a siding leading to a gravel quarry and picked up about 8 gondola cars loaded with gravel. The engine backed out of the siding, temporarily dropped the gondola cars and continued backward into another siding behind a distillery to pick up two box cars. Banning performed the coupling in this operation. In doing so he alighted from the engine and walked around on the road bed. At this point there was a thin layer of mud about two inches thick and Banning got mud on his boots. The crew worked on this siding for about 15 minutes. After coupling the cars, Banning got upon the engine and stayed there about 3 or 4 minutes before it pulled

out. He was in a position where he could talk to the engineer and fireman. He was not on the ground again in that area.

The engine pulled the two box cars back to the location of the gondola cars where it again coupled with them. Banning made this coupling, but the ground was solid road bed with no mud. The engine then continued its backward course to the south, out of the quarry siding, into the main line, pushing the two cars from the distillery and pulling the cars from the quarry. The cars from the quarry were then cut off and left standing with brakes locked. The engine continued backing southwardly down the main line pushing the two cars to a point about 1,000 feet to the south of where it had left the other cars standing. Then the crew proceeded to make a drop or a flying switch in the following manner: The engine started northward pulling the two cars toward the standing cars and got up a speed of 12 to 14 miles per hour. It then slowed down and created a slack between it and the two cars which were uncoupled from the engine. The engine then speeded up and passed over a switch leading from the main line down a dead end siding. After the engine went off into the siding the switch was immediately thrown back so that the free running cars following the engine passed on and continued down the main line. They would thus run into and become coupled to the standing cars from the quarry, eliminating the engine from the middle. The combined cars were to be then pushed to the yards.

Banning was on the front end of the box car nearest the engine. He uncoupled the cars from the engine when the engine created slack. He then climbed a ladder on the moving car to a brake platform where it was his duty to operate the hand brake in order to control the speed of the box cars and slow them down so that they would make an easy contact and an automatic coupling with the standing cars. Banning claims that although he continuously applied the brake the cars had been pushed at such a speed that he only succeeded in slowing them to a speed of six or seven miles per hour when they hit the standing cars, and that the resulting impact and crash threw him off the brake platform on to the gravel car and then down on to the road bed. At the time of the collision he was standing on the platform with a firm foothold and with both hands on the brake wheel. He described the impact as having jerked his hands and feet loose. The accident occurred about 8:00 p. m. There was a misting or light rain at the time. Banning received injuries to his back.

At the close of all the evidence the Appellant moved for a directed verdict. The Court reserved decision on the motion and submitted the case to the jury. The jury found for the appellee in the sum of $41,-000. Appellant's motions for judgment non obstante veredicto and for a new trial were overruled and judgment was entered on the verdict.

The District Judge charged the jury in part as follows: "Plaintiff has charged in his complaint that the defendant failed to furnish him a safe place in which to work, in two respects; first, that he was directed and required to work in the yard under muddy conditions, so that his boots became slippery and covered with mud; and, second, that defendant dropped the car upon which plaintiff was riding in the performance of his duties, at such a high, dangerous and excessive rate of speed that plaintiff did not have the opportunity to bring it to a stop by means of the braking apparatus * * * so that plaintiff was thrown therefrom to the ground and road bed, sustaining injuries complained of." He further said: "Now, of course, in a case of this type, under the law under which the action is brought here, no recovery may be had unless you find that defendant was negligent in one or the other respects as claimed by the plaintiff. * * It is the law that it was the duty of the defendant railway company towards the plaintiff to exercise reasonable care, to furnish him a reasonably safe place in which to work." Appellant contends that the evidence was insufficient to submit the case to the jury under either of the two claims of negligence, namely, (1) requiring the appellee to work under muddy conditions, and (2) performing the switching operation at a dangerous and excessive rate of speed.

■ There was a conflict in the evidence as to the speed at which the switching operation was performed. Banning testified that the engine and the two cars were traveling at a speed of from 12 to 14 miles an hour at the time the drop was made; that by the time he had ascended the ladder and reached the braking platform just before the cars crossed Harrison Avenue the speed was about 10 or 11 miles an hour; that at the time of the impact the speed was about 6 or 7 miles an hour, and that he was unable by the use of the brake to reduce the speed below that. A brakeman, who was standing by the tracks on Harrison Avenue, estimated the cars were traveling 3 to 4 miles per hour when they passed him. No defect in the brake was claimed or shown. Appellant's evidence also was to the effect that the first of the gondola cars was from 200 to 230 feet north of Harrison Avenue that the grade from Harrison Avenue to the gondola cars was absolutely level, and that according to Banning's own estimates it would take the box cars more than 17 seconds to cover the distance from Harrison Avenue to the point of impact. It is contended that Banning's testimony is consistent with failure on his part either to apply sufficient pressure to the brake when he had plenty of opportunity to do so, or with his own failure of judgment in waiting too long before applying the pressure. Whether the crash contact was the result of excessive speed, or caused by Banning's failure to properly use the braking mechanism, presented a disputed question of fact. The District Judge was correct in submitting this issue to the jury. Bailey v. Central Vermont Ry. Co., 319 U.S. 350, 63 S. Ct. 1062, 87 L.Ed. 1444; Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916; Ellis v. Union P. R. Co., 329 U.S. 649, 67 S.Ct. 598, 91 L.Ed. 572; Norfolk & W. Ry. Co. v. Fraley, 6 Cir., 69 F.2d 775.

■ The evidence respecting whether the appellant was negligent in requiring Banning to work under muddy conditions resulting in muddy boots which caused him to slip and fall from the brake platform was not sufficient to take that issue to the jury. Troublesome or severe climatic conditions are commonplace in the year-round operation of interstate carriers. A temporary dangerous working condition resulting therefrom is not by itself a negligent failure on the part of the carrier to provide the employee a safe place in which to work. Missouri P. R. Co. v. Aeby, 275 U.S. 426, 48 S.Ct. 177, 72 L.Ed. 351; McGivern v. Northern P. Ry. Co., 8 Cir, 132 F.2d 213. If reasonable steps are taken or means provided by the carrier to counteract or avoid the danger, it is not negligence to continue with the operation of the train. It would be most unusual for a railroad to discontinue its operations because of a rainy day. Actually, it rarely happens for that reason alone. The fact that appellee got mud on his boots while working during or after a rain is not in our opinion any evidence of failure on the part of the carrier to furnish the appellee a safe place in which to work. Nor does the evidence show in any way that appellee was required to work thereafter without being afforded an opportunity to counteract any danger resulting therefrom. He had ample opportunity while waiting on the engine to clean his boots of mud. He was where he could talk to the engineer, and the conditions were such that he could have requested and received any additional time needed for freeing his boots of mud if they needed such cleaning. It was some time later and in an entirely different location when the accident happened. The two incidents are entirely separate and distinct.

■ The District Judge accordingly erred in submitting to the jury both the issue of excessive speed and the issue of the muddy conditions under which appellee worked some time prior to the accident. Only the issue of excessive speed should have been so submitted. The verdict rendered by the jury was a general one with no way to determine on which of the two issues it was based. Under such conditions the appellant is entitled to a new trial. Wilmington Star Mining Co. v. Fulton, 205 U.S. 60, 77-79, 27 S.Ct. 412, 51 L.Ed. 708; Rashaw v. Central Vermont Ry., 2 Cir., 133 F.2d 253, Roth v. Swanson, 8 Cir., 145 F.2d 262, 269. See also Katila v. Baltimore & O. R. Co., 6 Cir., 104 F.2d 842.

■ Appellee invokes the "unitary rule of negligence" to justify the submission of the mud issue, contending that the mud, rain, wet braking platform and speed of the cars formed one continuous chain of circumstances which led to his injury. The case could have been presented and properly submitted to the jury in that manner. Union P. R. Co. v. Hadley, 246 U.S. 330, 332, 38 S.Ct. 318, 62 L.Ed. 751; Blair v. Baltimore & O. R. Co., 323 U.S. 600, 604, 65 S.Ct. 545, 89 L.Ed. 490. But that theory was not the one requested by the appellee nor the one used by the Court. The appellant specifically requested that the jury be charged that it was not negligent in causing appellee to work on muddy ground, but the instructions of the Court permitted a verdict on this specific item of alleged negligence by itself.

Several rulings on evidence are also complained of which should be reviewed for the purposes of a new trial.

■■ Banning was permitted to testify, over appellant's objection, that he had never ridden on a freight car that came into contact with another portion of the train at as high a rate of speed as the one involved in the accident. He had made some 25 or 30 flying switches previously. No foundation was laid to show the circumstances, distance, grade or other conditions of such previous operations. We believe the testimony was improperly admitted. Several factors can affect the speed at the time of impact, variable under different operations, irrespective of the initial speed given to the free rolling cars. It is a well established rule of evidence that circumstances under which other comparable conduct occurs should be substantially similar. Wigmore on Evidence, 3rd Ed., Vol. II, Sec. 459, 460; Chesapeake & O. Ry. Co. v. Thomason, 6 Cir., 70 F.2d 860; People v. Gotshall, 123 Mich. 474, 479, 82 N.W. 274; Trask v. Boston & Maine R. R., 219 Mass. 410, 415, 106 N.E. 1022.

■ The District Judge sustained objections to questions addressed by appellant's counsel to the conductor and engineer asking whether in their opinion the drop switch was or was not a normal one. In each instance the indicated answer was that it was a normal one. Both witnesses had years of experience. The general rule permits a witness who is experienced in technical matters and qualified to do so, to give his opinion in a matter which is not one of common knowledge, although it involves an ultimate fact to be finally decided by the jury. Eastern Transportation Line v. Hope, 95 U.S. 297, 24 L.Ed. 477; Empire Oil & Refining Co. v. Hoyt, 6 Cir., 112 F.2d 356, 360; Wabash Screen Door Co. v. Black, 6 Cir., 126 F. 721, 727; Ekblom v. G. O. Reed, Inc., 5 Cir., 71 F.2d 399; Walsh v. W. P. Rend Collieries Co., 7 Cir., 228 F. 311. Appellant's contention that the general rule is applicable in the present case, in that the proper operation of a railroad involves a combination of factors not within the knowledge of the average juryman appears to have support in the authorities. Grand Trunk Western Ry. Co. v. Lindsay, 7 Cir., 201 F. 836, 844, affirmed 233 U.S. 42, 34 S.Ct. 581, 58 L. Ed. 838, Ann.Cas.1914C, 168; Chicago G. W. Ry. Co. v. Price, 8 Cir., 97 F. 423; Norfolk & Western Ry. Co. v. Gillespie, 4 Cir., 224 F. 316, 320; Pittsburgh, S. & N. R. Co. v. Lamphere, 3 Cir., 137 F. 20, 23; Union Pac. Ry. Co. v. Novak, 9 Cir., 61 F. 573, 579-580; Bellefontaine & I. R. Co. v. Bailey, 11 Ohio St. 333, 335. We are of the opinion that the testimony should have been received.

[11] Dr. Conley's testimony should have been confined to the X-ray pictures without reference to appellee's pain, about which he had no personal knowledge.

We think the identification by the witness Groves of the man "from the D. T. & I. Railroad" was sufficient under all the circumstances, including the agent's own prior testimony, to permit the witness to give the rebuttal testimony complained of.

The judgment of the District Court is reversed and the case remanded for a new trial in accordance with the views expressed herein.